## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



**FILED**

Aug 04 2016, 8:39 am

**CLERK**
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Anthony C. Lawrence
Anderson, Indiana

ATTORNEYS FOR APPELLEE

Gregory F. Zoeller
Attorney General of Indiana

Eric P. Babbs
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

Clarence Parsley,
*Appellant-Defendant,*

v.

State of Indiana,
*Appellee-Plaintiff.*

August 4, 2016

Court of Appeals Case No.
48A02-1511-CR-1989

Appeal from the Madison Circuit Court

The Honorable David A. Happe, Judge

Trial Court Cause No.
48C04-1111-MR-2018

**Riley, Judge.**

## STATEMENT OF THE CASE

Appellant-Defendant, Clarence Parsley (Parsley), appeals his conviction for murder, a felony, Ind. Code § 35-42-2-1 (2011); and prisoner possessing device or material, a Class B felony, I.C. § 35-44-3-9.5 (2011).

We affirm.

## ISSUES

Parsley raises two issues on appeal, which we restate as:

(1) Whether the trial court abused its discretion by admitting a photograph of the victim, taken at a wedding years before the incident, to establish his identity and the fact that he was alive prior to his murder; and

(2) Whether the trial court erred by permitting the jury to view Parsley in ankle restraints during his testimony.

## FACTS AND PROCEDURAL HISTORY

On May 28, 2011, Timothy Knapp (Knapp) and Parsley were both incarcerated at the Pendleton Correctional Facility Disciplinary Diagnostic Center and housed in Unit 6D of its segregation wing. Knapp occupied Cell 1; while Parsley was in Cell 8. On that day, Knapp and Parsley each requested recreation time. A correctional officer escorted Knapp to the recreational area, where Knapp was patted down before being placed in recreational cell 2. Parsley was placed adjacent to Knapp, in recreational cell 3. At the time the

altercation between Knapp and Parsley started, no correctional officers were present. According to Parsley, Knapp directed "a derogatory statement" to him within fifteen minutes of commencing the recreation period. (Transcript p. 1010). After about forty-five minutes, Parsley noticed Knapp trying to pry a piece of fence off of Parsley's recreational cell. Knapp told him that "he was coming over to beat [his] ass" and called him "a snitch" loud enough for the other prisoners to hear. (Tr. pp. 1013, 1018). Parsley grabbed part of the fence in an effort to prevent Knapp from breaking it. However, determining his efforts to be futile, Parsley entered Knapp's recreational cell and started struggling with Knapp. He claimed that Knapp pulled out "a weapon" which he started "swinging" at Parsley's face and neck. (Tr. p. 1029).

[5] Multiple officers arrived on the scene. They noticed the two men in the same recreational cell, with Parsley standing over Knapp and Knapp asking the officers to help him because Parsley was "killing [him]." (Tr. p. 598). Parsley was holding a metal shank and was repeatedly stabbing Knapp with it. One of the officers summoned an emergency response team to intervene. Meanwhile, other officers pepper sprayed Parsley and ordered him to drop the shank and back away from Knapp, to no avail. Parsley cut Knapp with the shank forty times. Eventually, Parsley dropped the shank, backed up to the cuff port, and was cuffed by the officers. The paramedic who examined Knapp noted that Knapp had no pulse and was not breathing—resuscitation attempts failed and he was pronounced dead. Of the forty stab wounds Knapp suffered, five were

determined to be lethal and had been inflicted to Knapp's heart, chest cavity, and kidney.

[6] On November 1, 2011, the State filed an Information, charging Parsley with murder and prisoner possessing dangerous device or material. On June 2 through June 5, 2015, the trial court conducted a jury trial. During the trial, Rose Eggers (Eggers), Knapp's mother, testified. Prior to Eggers taking the stand, Parsley objected to her testimony as being cumulative, prejudicial, and without any evidentiary value. He also objected to the admission of Knapp's photograph through Eggers' testimony. The photograph was taken years before this incident at Knapp's brother's wedding and depicted Knapp from the waist up, dressed in wedding attire. Parsley claimed that the earlier introduction of Knapp's autopsy photos juxtaposed with this photograph would create a prejudicial effect. The trial court overruled both objections.

[7] Prior to Parsley testifying, his counsel objected to the continued use of ankle restraints that Parsley had worn throughout the trial when seated at the defense table. While the restraints were hidden from view at the defense table, they would be visible to the jury while seated at the witness stand when the jury proceeded into the courtroom. The State objected to Parsley's request to remove the ankle restraints based on the nature of the charged crime and his present incarceration for his prior voluntary manslaughter conviction. The trial court provided three alternatives to Parsley, *i.e.*, (1) moving the proceedings to another courtroom; (2) having him testify from the counsel table; or (3) having him testify from the witness stand with a temporary visual blockade. Defense

counsel rejected these alternatives as these appeared to treat Parsley different from the other witnesses.

[8] At the close of the evidence, the jury returned a guilty verdict on both Counts. On October 19, 2015, the trial court conducted a sentencing hearing and sentenced Parsley to sixty years for murder and fifteen years for prisoner possessing dangerous device or material. The trial court ordered the sentences to run consecutively to each other and consecutively to Parsley's sentence in a different cause.

[9] Parsley now appeals. Additional facts will be provided as necessary.

## DISCUSSION AND DECISION

### I. *Admission of Evidence*

[10] Parsley contends that the trial court abused its discretion by admitting into evidence a photograph of Knapp. The photograph was taken several years ago at Knapp's brother's wedding and was introduced to the jury through Knapp's mother's testimony. It depicts Knapp from the waist up, dressed in formal wedding attire and without any other individuals present. Parsley maintains that "[t]he photograph was then juxtaposed against gruesome autopsy photos to enflame the passions of the jury." (Appellant's Reply Br. p. 6). Accordingly, Parsley argues that the State introduced the photograph as victim-impact evidence designed to play to the jury's sympathy and therefore it was cumulative and prejudicial. The State claims that the photograph was relevant

to prove that Knapp was alive, which was not contested by Parsley, and to establish Knapp's identity.[1]

[11] Because the admission and exclusion of evidence falls within the sound discretion of the trial court, this court reviews the admission of photographic evidence only for an abuse of discretion. *Wilson v. State*, 765 N.E.2d 1265, 1272 (Ind. 2002). All relevant evidence is generally admissible. Ind. Evidence Rule 401. Relevant evidence is "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be within the evidence." *Id*. Relevant evidence, including photographs, may be excluded only if its probative value is substantially outweighed by the danger of unfair prejudice. *Id*. "Even gory and revolting photographs may be admissible as long as they are relevant to some material issue or show scenes that a witness could describe orally. *Wilson*, 765 N.E.2d at 1272. Photographs, even those gruesome in nature, are admissible if they act as interpretative aids for the jury and have strong probative value. *Id*.

[12] Because murder involves the taking of a human life, the trier of fact must be given some proof that the victim is actually dead but was alive before the date and time of the killing. *Humphrey v. State*, 680 N.E.2d 836, 842 (Ind. 1997). "The picture of a victim taken during life is technically relevant to establishing

---

[1] In its appellate brief, the State also asserts that the photograph was relevant because it emphasized the size difference between Knapp and Parsley and also served as an evaluation of a claim of self-defense. However, the State did not advance these grounds before the trial court and they are therefore waived. *See Craig v. State*, 883 N.E.2d 218, 220 (Ind. Ct. App. 2008).

that the victim was alive before the murder." *Pittman v. State*, 885 N.E.2d 1246, 1256 (Ind. 2008) (quoting *Humphrey*, 680 N.E.2d at 842). But, like here, that fact is rarely contested and usually easily established by less dramatic evidence. *Pitman*, 885 N.E.2d at 1256. The State introduced the photograph through Knapp's mother while questioning her about the circumstances and the moment she was notified of her son's death. "This smacks of victim impact evidence and is to be discouraged due to its possible emotional impact on the jury." *Humphrey*, 680 N.E.2d at 842.

[13] When this photograph was introduced, the jury had already seen photographs of Knapp's gruesome injuries. They also had heard the testimony of multiple witnesses—three correctional officers, a state police investigator, and a forensic pathologist—who had talked to Knapp on the day of the incident and who had identified him by sight, height, weight, and appearance. Juxtaposing those photographs with a picture of a young, healthy, and celebratory victim created a prejudicial impact that outweighed the photograph's probative value. Therefore, we conclude that the admission of Knapp's photograph was error.

[14] Nevertheless, if a trial court abused its discretion by admitting the challenged evidence, we will only reverse for that error if "the error is inconsistent with substantial justice" or if "a substantial right of the party is affected." *Payne v. State*, 854 N.E.2d 7, 17 (Ind. Ct. App. 2006). Any error caused by the admission of evidence is harmless error for which we will not reverse a conviction if the erroneously admitted evidence was cumulative of other evidence appropriately admitted or if "the conviction is supported by

independent evidence of guilt such that there is little likelihood that the challenged evidence contributed to the verdict." *Id.*; *Blount v. State*, 22 N.E.3d 559, 564 (Ind. 2014). Evidence was presented that Parsley stabbed Knapp forty times, with five of those wounds being fatal. Several correctional officers testified that Parsley continued stabbing Knapp even after being ordered to stop and after being pepper sprayed. Accordingly, given the "avalanche of evidence" of Parsley's guilt, we conclude that the erroneous admission of Knapp's photograph was harmless. *Weedman v. State*, 21 N.E.3d 873, 895 (Ind. Ct. App. 2014), *trans. denied*

## II. *Ankle Restraints*

[15] Next, Parsley contends that the trial court abused its discretion when it forced him to testify while wearing ankle restraints. A defendant has the right to appear in front of a jury without physical restraints, unless such restraints are necessary to prevent the defendant's escape, to protect those in the courtroom, or to maintain order during trial. *Bivins v. State*, 642 N.E.2d 928, 936 (Ind. 1994), *cert. denied*, 516 U.S. 1116 (2000). This right springs from the basic principle of American jurisprudence that a person accused of a crime is presumed innocent until proven guilty beyond a reasonable doubt. *Wrinkles v. State*, 749 N.E.2d 1179, 1193 (Ind. 2001), *cert. denied*, 535 U.S. 1019 (2002). For this presumption to be effective, courts must guard against practices that unnecessarily mark the defendant as a dangerous character or suggest that his guilt is a foregone conclusion. *Id*. As such "the facts and reasoning supporting the trial judge's determination that restraints are necessary must be placed on

the record.[2] *Id.* (citing *Coates v. State*, 487 N.e.2d 167, 169 (Ind. Ct. App. 1985), *overruled on other grounds by Hahn v. State*, 533 N.E.2d 618 (Ind. Ct. App. 1989)). Typical methods of restraint include handcuffs, shackles, security chairs, and gagging a defendant. *Wrinkles*, 749 N.E.2d at 1193. An order to restrain a defendant is reviewed for an abuse of discretion. *Forte v. State*, 759 N.E.2d 206, 208 (Ind. 2001).

[16] During a pretrial hearing, the parties discussed the security measures to be taken during the trial. Parsley's classification within the correctional facility was high and, even at the time of trial, he remained segregated from the general prison population. Parsley's counsel informed the trial court that "[i]f it's simply ankle restraints, we don't object." (Tr. p. 284). "I want his arms to be open so he can take notes, consult with us. We're not afraid of him." (Tr. p. 285). But he cautioned that he did not agree to his client wearing ankle restraints when "he takes the stand." (Tr. p. 284). The State objected to taking the ankle restraints off on the stand, but suggested to place Parsley on the witness stand outside the presence of the jury "so nobody see them." (Tr. p. 284). The parties also noted that a Department of Correction S.E.R.T. team of six officers dressed in black suits would be present in the courtroom during the proceedings to monitor Parsley.

---

[2] In his reply brief, Parsley, for the first time, asserts that the trial court's record is insufficient. However, parties may not raise an issue for the first time in a reply brief. *See, e.g., Sisson v. State*, 985 N.E.2d 1, 20 n.9 (Ind. Ct. App. 2012), *trans. denied*. Accordingly, Parsley waived the allegation.

[17] Prior to Parsley taking the witness during the trial, the parties again discussed Parsley's ankle restraints, which had been invisible to the jury under the defense counsel's table. However, due to the design of the witness stand, when testifying, the jurors, especially those seated "in the far right hand corner of the jury box[,] are likely going to be able to see [Parsley's] feet and shackles when he testifies." (Tr. p. 976). The trial court agreed that nobody "would dispute that it's a possibility that if the jurors look down there they're going to see his shackles as they're coming into the jury box." (Tr. p. 978). The State objected to removing the ankle restraints "given the nature of this crime, and the reason that he is currently incarcerated" for a voluntary manslaughter offense. (Tr. pp. 981-82). When Parsley repeated his objection to testifying wearing his ankle restraints, the trial court offered him three alternatives: (1) Parsley could testify from the counsel table; (2) the proceedings could be moved to a different courtroom with a witness box that was more discreet; or (3) he could testify from the witness stand "with the shackles on but with some temporary visual blockade[.]" (Tr. p. 977). Parsley rejected all offered options because he did not want to be "treated any different than any other witness . . . that would make the jury treat his testimony differently." (Tr. p. 977). Accordingly, Parsley elected, with objection, to testify at the stand with his shackles on. Defense counsel further noted

> [p]art of our reason in doing this is there are six (6) S.E.R.T. Team members here. I don't think that there's probably any juror that hasn't realized that they're there with [Parsley] as security personnel, not as his friends. And so I doubt that they don't realize that he's in custody anyway.

(Tr. p. 980).

[18] "Protection of those in the courtroom is a recognized reason for restraining a defendant, and the facts and circumstances before the trial court support that rationale." *Overstreet v. State*, 877 N.E.2d 144, 160 (Ind. 2007), *reh'g denied*. Here, Parsley wore ankle restraints during the trial proceedings, which were invisible to the jurors, except for when he was testifying from the stand. While the trial court acknowledged the likelihood of some jurors noticing the shackles, Parsley does not direct us to any evidence establishing that the jurors actually saw him shackled. Parsley had a high security classification, had been convicted of manslaughter, and was standing trial for a particular violent murder. At all times, six S.E.R.T. members were present in the courtroom to monitor Parsley's behavior. Accordingly, even though Parsley behaved at trial, he had a history of violent acts committed against others such as to make him a security risk. *See Forte*, 759 N.E.2d at 208 (a trial court may consider the defendant's history of behavior outside of the courtroom when deciding whether shackling would be necessary during trial). Moreover, the jury was aware that Parsley was incarcerated in a maximum security prison because that was the setting of the current charge. Therefore, "[i]n a trial such as the case at bar, jurors would reasonably expect that any one in police custody would be restrained." *Malott v. State*, 485 N.E.2d 879 (Ind. 1985). We cannot conclude that Parsley's presumption of innocence was undermined in a significant way. *See Wrinkles*, 749 N.E.2d at 1193. "A defendant is entitled to a fair trial, not a

perfect one." *Inman v. State*, 4 N.E.3d 190, 203 (Ind. 2014). The trial court did not abuse its discretion.

## CONCLUSION

[19] Based on the foregoing, we conclude that it was harmless error to admit a photograph of the victim, taken at a wedding and years before the incident, and the trial court did not abuse its discretion by permitting the jury to likely view Parsley in ankle restraints during his testimony

[20] Affirmed.

[21] Kirsch, J. and Pyle, J. concur